## Anderson v. Commonwealth.

(Decided October 31, 1924.)

### Appeal from Bourbon Circuit Court.

1. Criminal Law—Assignment that Court Erred in Refusing Continuance Not Considered in Absence of Affidavit.—Assignment that court erred in refusing continuance on motion, supported by affidavit, cannot be considered, where affidavit is not in record.

2. Criminal Law—Homicide—Evidence of Giving of Check Signed by Accused in Name of Deceased Admissible, but Not Opinions as to Forgery, or Testimony that Administrator so Said.—In homicide case, court properly admitted evidence to show that defendant had bought automobile in deceased brother's name, and had signed his name to check payable to defendant, to show motive; but witnesses should not have been allowed to express opinions as to whether check transaction was forgery, or to testify that administrator had said it was forgery.

3. Criminal Law—Complaint of Exclusion of Evidence Treated as Waived, Where Attention of Court Not Called to Evidence.—

. Complaint that defendant was not allowed to introduce evidence will be treated as waived, where attention of court has not been called to any evidence so excluded.

4. Criminal Law—Where there is Any Evidence Tending to Show Guilt, Case should go to Jury.—Where there is any evidence, however slight, tending to show guilt, case should go to jury.

5. Criminal Law—Duty of Court to Admonish Jury as to Purpose of Evidence on Request.—When evidence was offered in homicide case tending to show forgery of deceased's name by defendant, if accused requested that jury be advised of purpose for which evidence was offered, it became duty of court to admonish jury that evidence was admitted solely to show motive.

6. Criminal Law—Error in Admission of Evidence Waived by Failure to Object.—Any error in admission of evidence was waived by failure to object.

7. Criminal Law—Court Need Not Admonish Jury as to Purpose of Evidence in Absence of Request.—Right to have jury admonished as to purpose of evidence was waived by failure to request admonition.

8. Criminal Law—Admonitions as to Purpose for which Evidence May be Considered Need Not be in Writing.—Admonitions as to purpose for which evidence may be considered need not be in writing.

9. Criminal Law—Witnesses—Diagrams on Floor should Not be Used, but, if Used, Copy should Accompany Record.—Diagram should not be drawn upon floor of courtroom, and be referred to in testimony; but, if such diagram is used, copy of it should accompany record.

10. Homicide—Verdict of Voluntary Manslaughter Held Flagrantly Against Evidence.—Verdict of voluntary manslaughter held flagrantly against evidence.

W. C. MARSHALL, ROGERS T. MOORE and RAYMOND CON-NELL for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

The appellant, charged with murder, was found guilty of voluntary manslaughter, and his punishment fixed at confinement in the penitentiary for eighteen years. He has assigned in his motion and grounds for new trial six different reasons.

The first is that the court erred in refusing to grant a continuance on his motion, supported by his affidavit, but as that affidavit is not in the record, this cannot be considered.

The second reason is that the court erred in admitting evidence tending to show that the appellant had bought an automobile in his brother's name (this brother was Will Anderson, the deceased), and had signed the name of deceased to a check for $550.00 payable to the accused. The appellant's connection with the crime is shown only by circumstantial evidence, and it is therefore important that some motive for the commission of the crime should be shown.

For this purpose, it was proper for the Commonwealth to show the giving of the check and the making of the contract for the purchase of the automobile, but the witnesses should not have been allowed to express their opinions as to whether or not the check transaction was a forgery; neither should the witness McClure have been allowed to state that he had been informed by the administrator of Will Anderson's estate that the check was a forgery. Upon the retrial of this case the court will confine the witnesses to a statement of what they know about these transactions, without permitting them to express their opinions.

However, do these transactions show a motive? Appellant says that he signed the name of the deceased to this check at his direction, and that he had given the deceased a note for the amount of the check secured by a mortgage on a hay bailer, to pay for which the check was given, and in the automobile transaction appellant had traded in his automobile at $300.00, and the new machine was bought in the name of the deceased. So far as the check was concerned the appellant had nothing to gain by his brother's death, and in the automobile transaction, he would lose the value of his automobile. Thus, with an automobile to lose on the one hand and nothing to gain on the other, there appears but little motive from these transactions.

The third complaint is that he was not allowed to introduce competent evidence which he offered, but our attention has not been called to any evidence so excluded, and this will be treated as waived.

At the conclusion of all the evidence, the accused moved the court to direct the jury to find him not guilty. His motion was overruled, and he assigns this as his fourth ground for a new trial; but as there was some evidence, this motion was properly overruled. Where there is any evidence, however slight, tending to show guilt of the accused, the case should go to the jury. Spicer v.

Commonwealth, 199 Ky. 658, 251 S. W. 853; Belcher v. Commonwealth, 181 Ky. 516, 205 S. W. 567; Ratliff v. Commonwealth, 182 Ky. 246, 206 S. W. 497; Levering v. Commonwealth, 132 Ky. 666, 117 S. W. 253, 136 Am. St. Rep. 192, 19 Ann. Cases 140.

His fifth reason for a new trial is that the court erred in giving to the jury the instructions which it did and in failing to give to the jury other instructions which the accused insists should have been given. We have carefully examined the instructions given and are unable to find any fault with them, and the accused has not, in his brief, pointed out any error therein. He insists, however, that the court erred in not instructing the jury in writing upon the purpose for which the evidence of the giving of the check and the purchase of the automobile was admitted. When this evidence was offered, if the accused had requested that the jury be advised of the purpose for which it was offered, it then would have been the duty of the court to admonish the jury that this evidence was offered solely for the purpose of showing, if it did show, possible motive which the accused may have had for the commission of the crime, if he did commit it.

When evidence regarding the check was offered, the court did admonish the jury of the purpose for which it was offered; but in giving this admonition the court improperly used the expression "forged the name of his brother upon a check." Upon a retrial of this case the court will not use that expression. When the evidence regarding the purchase of the automobile in the name of Will Anderson was offered there was no objection, hence that must be treated as waived. There was no request to the court to admonish the jury upon the purpose for which that was offered, so that must be treated as waived. Haywood v. Commonwealth, 161 Ky. 338, 170 S. W. 624; Bennett v. Commonwealth, 175 Ky. 540, 194 S. W. 797.

It was not necessary that these admonitions as to the effect of the evidence be in writing. Ochsner v. Commonwealth, 128 Ky. 761, 109 S. W. 326; Wendling v. Commonwealth, 143 Ky. 587, 137 S. W. 205. The appellant argues rather strenuously that a written instruction in this case upon these questions should have been given, and bases his argument upon the case of Commonwealth v. Brand, 166 Ky. 753, 179 S. W. 844. But in that case the court said: "It would have been prejudicial error to the substantial rights of the appellee if the court had not given

the instruction or a similar one if requested." There was no such request in this case.

This brings us now to the sixth and last reason for new trial, which is that the verdict of the jury was palpably and flagrantly against the evidence. Will Anderson was a colored man who lived with his brother, the accused, and his sister and her infant son, upon a small tract of land situated upon the Lexington and Maysville turnpike in Bourbon county, Kentucky, and a little more than one mile south of Millersburg. Some one shot and killed Will Anderson with a shotgun between 8:15 and 8:30 on the evening of August 18, 1923. The identity of the slayer is not established, but there were some circumstances in the case which tended to implicate the appellant.

The proof for the Commonwealth showed that a colored man in Millersburg claimed to have loaned the appellant a shotgun about eight o'clock on the evening of Friday, August 17, 1923, and had sold him, as he says, seven shells described by the witnesses as fives and sixes. Three witnesses besides Burdell testified that they saw appellant going from Millersburg toward home with this shotgun. The evidence showed that Percy Anderson, the appellant, had at his home a double-barreled shotgun, a single-barreled shotgun and a rifle. With these guns of his own, it seems strange that he should borrow a gun from Burdell.

On August 25th a shotgun was found in the garden of a man named Dennis about 200 yards from the place where this crime was committed. This shotgun was identified by the witness Burdell as the gun which he says he loaned to the appellant on August 17, and at the time this gun was found there was in it an empty shell which was of the same color as the shells which he says he sold to appellant. A shotgun wad was found in the road near where the shooting took place, and that wad had on it the figure six.

Appellant was proved to have asked the witness, Dennis, during the week that followed the killing, if he had dug his potatoes. It was in the potato patch of this man Dennis that this gun was found. Beneath this gun there was found a handkerchief and on this handkerchief there was a mark of an indelible pencil, and in the pocket of a pair of pants worn by the appellant on the evening of the killing there was also found the mark of an indelible pencil. The name of the witness which appellant admits signing to the check and his endorsement

of the check were also written with indelible pencil. This evidence, together with possible motive which might be inferred from the check and automobile transactions, was all the Commonwealth had to show any connection between the appellant and the killing.

The appellant's defense was an *alibi*. He began with Friday, the 17th, and showed that he went to Paris that afternoon, that he started to walk to Paris, but was overtaken by a white man, Robert Johnson, who was traveling in a new Chevrolet automobile, and he invited him to ride, that appellant rode to Paris with Johnson. Johnson was introduced and testified that about half way between Millersburg and Paris he picked up appellant one afternoon about this time, and that appellant rode with him to Paris, arriving there about 2:30. Johnson was unable to say what day this was but said it was shortly before the shooting, but he remembers that this was the only occasion that he ever had the appellant ride with him to Paris.

Appellant's purpose in going to Paris, as he said, was to sell his grass seed, and he gave his first attention to that matter; but about three o'clock in the afternoon he pased the home of Nancy Simpson, a colored woman, and stopped and talked to her on her porch until about seven or seven-thirty, as he says.

Nancy Simpson was introduced as a witness and said that the appellant was at her home that afternoon from 3:30 until about 6:30 or 7:00; that he ate his supper there. Both appellant and the Simpson woman testified that Margaret English, a white girl, passed there that afternoon and saw the appellant on the Simpson porch, and that at the request of Nancy Simpson, Margaret English, on her first trip to the grocery, brought them five bottles of pop, and later brought them some sugar on her second trip to the grocery. They do not fix a definite time that these purchases were made.

Margaret English was introduced and testified to these same facts, and fixed the time of her trips to the grocery as between five and six in the afternoon.

After eating his supper appellant left there and says that he met his sister-in-law, Nancy Anderson, on the streets of Paris twice that evening. The first time was between 5:30 and 6:00, the second between 7:30 and 8:00; that each time he talked with her a short time. With her was her daughter, Katherine White Anderson, niece of the appellant. Nancy Anderson was introduced as a

witness and supported this statement, and said she met him on the two occasions named; that the first meeting was on Main street, and the second on Eighth street. She fixed the time of the meeting on Eighth street at "maybe half-past five or six, somewheres along in there." She was unable to state the time positively but said it was not dark, and that it got dark somewhere around 7:30 or 8:00.

Her daughter, Katherine White Anderson, testified to these same things, but she fixed the time of the first meeting which was on Main street at about 5:30 or 6:00 and the time of the second meeting at between 7:30 and 8:00. Sundown on August 17 was about seven or eight minutes before seven o'clock.

Appellant claims to have "fooled around" there in Paris until nine o'clock; that after leaving his sister-in-law and niece, he got a parcel at Quinn Bros.' and some ice cream at a restaurant, and then went to Bud Megan's pool room and spent some time there; that just after nine o'clock he started to walk home and on his way he was overtaken by two young men in a car and rode with them to his home. It was something after ten o'clock when he got home.

Twice in his direct examination, Burdell fixed the time he claims to have loaned this gun to appellant at "about 8 o'clock," and once in his direct examination he fixed this time at 8:00 or 8:30, and testified that he closed his store at 8:30 or 9:00.

On the evening of the killing, appellant claims that after he had eaten his supper and tended to his stock he washed and dressed himself and went to Millersburg; that first he went to the post office to mail some letters, and that while in the post office he looked at the clock and saw that it was 7:30. From the post office he went to a small place of business kept by one Joe Green, where he tried to buy some overalls, but Green did not have the sort of overalls appellant wanted, so after talking with Green a few minutes, he left. Green was introduced as a witness and testified that appellant was in his store "betwixt seven and eight o'clock."

Appellant next claims to have gone to Harry Taylor's restaurant where he bought a sandwich; he was there about five minutes. From there he went out on the street where he met his cousin, Charlie Anderson, with whom he talked about twenty minutes in front of Clark's livery stable. Charlie Anderson testified that he saw the appellant between 7:30 and 8:00 and had a conversation

with him; that he met him near Taylor's restaurant and had seen him come out of the restaurant and that they talked for about twenty minutes; that appellant left him and went in the direction of Main street. Appellant claims that after he left Charlie Anderson he started in the direction of Main street and stopped at Charlie Taylor's barber shop; that he got there about eight o'clock. He claims that Taylor owed him $3.00 and that he had called for the purpose of collecting. Appellant says this barber shop is a sort of loafing place for "us colored farmers."

The first one he saw when he entered the shop was Martha Taylor, wife of the proprietor; he says that her husband was busy and that he sat down and talked to her for a while. Appellant gave the names of several other people who were in the shop at the time: Will Green, Elias Victor, Julius January, James Vaughn, and claims to have remained at the shop continuously until Louis Massie came in and told him that his brother, Will Anderson, had been shot.

Martha Taylor said that appellant came into the shop about eight o'clock; that she talked to him a while and then left and went home, and that he was there when she left.

Charlie Taylor, the proprietor, said that appellant came into the shop about eight o'clock and remained there about 30 or 35 minutes, until Massie called for him and told him his brother had been shot.

Elias Victor testified that he saw appellant in this barber shop "sorta betwixt eight and nine o'clock" and that he was sitting by the side of Anderson when Massie came with the news that Will Anderson had been shot; that appellant was there when he came and that appellant remained there about thirty or forty minutes, when Massie brought the news about his brother.

Julius January testified that appellant came in about eight or a little after and was there when January left the shop, and as he left he met Louis Massie, who told him he was looking for Percy Anderson, and that he told Massie that Anderson was at the barber shop.

James Vaughn testified that he was in the barber shop when appellant came in. He fixed the time as between seven and eight o'clock, and said that appellant was in the shop when he left.

None of these witnesses say anything about any unusual acts or conduct, any nervousness or excitement upon the part of appellant.

Louis Massie testified that he was on the street in front of John Purnell's grocery and some one told him Will Anderson had been shot, and asked him to find Percy Anderson, the appellant, and tell him of it. He started to look for Percy Anderson and met Julius January, who told him that he was at the barber shop. He then went to the barber shop and told appellant that his brother had been shot; but he is unable to say at what time this happened; he said that he had nothing to fix his mind upon the time, and after he told the news, appellant got up and went out of the shop.

This little piece of land upon which the deceased and appellant lived belonged to them and their brothers and sisters, eight in all. They had inherited it from their parents. It adjoins the Lexington and Maysville Pike upon the west side. The house, according to witnesses, is about 400 or 500 yards from the road, and is reached by a small road or lane which leads up to it, which the witnesses describe as leading "kindly quartering off from the pike." Thus we may take it that this was a triangular shaped piece of land.

In the conduct of this case the witnesses constantly refer to a diagram which was drawn upon the floor of the court room. Where such diagrams are used they always result in the record's being very unsatisfactory and it has been with the greatest difficulty that we have arrived at many of the facts in this case, on account of the references in the evidence to this diagram, which we have not before us. It would be much better for this court and for the attorney general's office if such diagrams were not used, and if a diagram is used at all, a copy of it should accompany the record.

The place where Will Anderson was shot was about 200 yards from the pike and as you leave the pike and go to the place where he was shot, you cross the Louisville and Nashville Railroad and a small stream. We may presume that it was about 200 feet from the pike to the railroad, about the same distance from the railroad to this small stream and about that distance from the stream to where Will Anderson was shot. Upon the east side of this lane which leads to the Anderson home, there are a number of small cedar trees and it was from behind one of these trees, about 200 feet from this small stream, that some one shot Will Anderson.

The moon on that night was a little more than six days old. At the time of the shooting it was about three hours high. There is no direct evidence as to whether it was a bright night or a dark one, but we may take it that it was a bright night because the witness Dennis says he was able to recognize the witness Riggs when the latter came out his door on to his front porch. The property in which Riggs lives lies on the Lexington and Maysville pike just north of the mouth of this lane which leads to the Anderson property. Just north of that is the property then occupied by the witness Dennis, and north of that is the property occupied by the witness Fisher. All of this property is situated on the west side of the pike. We do not know anything about how far it was from the residence of Dennis to the residence of Riggs, but one witness did give the width of the Riggs property as 75 feet, and assuming that the Dennis property is about the same size, then Riggs was about 75 feet from Dennis at the time he saw him come out on the porch, and the night was light enough for Dennis to recognize him.

The witness Fisher states that the deceased told him that his assailant ran from the pike across his property to the cedar tree. There is nothing in the record to enable us to know what the distance was, but assuming the Anderson property to be triangular in shape, we know that this cedar tree was about 200 yards from the mouth of the lane, and we may take it that the cedar tree was about an equal distance from the pike, and from this we may assume that it was a bright night, else the deceased could not have seen his assailant run from the pike across to the cedar tree.

The wound in the body of the deceased was made by a shotgun and was described by Dr. Calhoun as a small wound. It was in his left side. From this we may infer that the deceased at the time he was shot, was going from the direction of Millersburg toward his home. We know he was in this lane when he was shot. He says that his assailant was just over the fence behind this little cedar tree. From the description of the wound as a small one, we know that the assailant was quite close to the deceased at the time he shot him.

The wound was a very serious one. The deceased must have known of its gravity for he was unable to walk and having tried to crawl to his house, was able to go only a few feet. In that condition, the statements of the deceased as to how this occurred and who shot him are

entitled to great weight. Will Anderson told the witness Fisher that he had seen the man run across his property from the pike to the cedar and that he had shot at him two or three times, but did not know whether he had hit him. He told Fisher that this fellow was stealing his potatoes. The witness Fisher found a pistol by the side of Anderson, with two empty chambers in it. As soon as this shooting occurred, Fisher dressed himself hurriedly, and looking at the clock, saw that it was 8:25. Fisher heard two pistol shots close together, followed just after by a shotgun shot.

Dr. Calhoun asked the deceased who shot him and he said he didn't know. He asked him if he saw the person. Anderson replied that he did, but he didn't know who it was. He described him as a man with a cap and brown suit on, probably a dark suit.

The deceased said to his sister, Lula Anderson, that he was shot by a tall, thin man with a dark suit on, and that this fellow was digging his potatoes.

The clothing worn by appellant on that evening was introduced in evidence, but there is nothing in the record from which we can tell anything about the color of the clothing, except that the pants were brown, and that appellant had on a light colored hat.

In none of the conversations with Fisher, Dr. Calhoun or Lula Anderson, did the deceased ever say he was unable to see his assailant. On the contrary, he said he did see him and he described him, but said he didn't know him.

Deceased was the brother of appellant. They lived together and if the appellant had been his assailant it is difficult to believe that the deceased would not have known him, under these circumstances.

We know that two shots had been fired by the deceased at this person, and these shots were fired just before the shotgun shot. We know these parties were close together from the size of the shotgun wound, and the probabilities are that one or both of the shots fired by the deceased struck his assailant. There was blood found upon the ground and upon stones in the field near this cedar tree. That blood looked about as fresh as the blood of the deceased which was found in the lane. This blood near the cedar tree is described as "a string of blood about two feet long." Some of this was on a rock which was picked up by the marshal and turned over to the sheriff. From this we may infer that the assailant

of the deceased was wounded and yet a day or so after-wards, appellant's body was examined and no wounds were found upon him.                      •

Immediately after he was advised that his brother was shot, the appellant went to him, and as soon as he had learned of the nature and gravity of the wound, he came to Millersburg and telephoned for an ambulance to take his brother to Lexington. He also telephoned and had the bloodhounds brought to the scene of the shooting. He went with his brother in the ambulance to Lexington, and stayed with him until he died. He came back the next day and searched about for evidence, and picked up the shotgun wad with the number "6" on it, which was turned over to the officer, and which was later introduced in evidence.

His actions and conduct are entirely inconsistent with his guilt. After the deceased was shot, he began to call for assistance and among those called for was his sister Lula and the appellant, Percy Anderson. As we have said before, the deceased saw his assailant. There is no direct proof that it was, but we may infer that it was a bright and moonlight night, and if the appellant had been the assailant of the deceased, the deceased would have known him. He would have been able to have told Fisher, Dr. Calhoun and his sister that it was Percy who shot him, and as he lay wounded in the road, calling for help, he would not have called for Percy Anderson.

There is another feature connected with this case which we are unable to understand, but which we feel is an important matter. There was an automobile stand-ing on the pike just south of the mouth of this lane lead-ing to the Anderson home, and just after the shooting, this car started up hurriedly and went in the direction of Paris. This automobile was stationed near the point where the deceased first saw his assailant and from which he ran across to the cedar tree, and it was possibly to this automobile that the murderer fled after the shooting and in which he escaped. As we have stated, the de-ceased at the time he was shot was coming from the direc-tion of Millersburg. We do not know whether he had been to Millersburg or not. There were two ways by which he could reach his home, one was by going up this lane, the other was by going through his property and crossing this stream on the bridge over it in his property. He may have been to Millersburg and have had trouble of some kind there. He may have seen this parked auto-

mobile. We know he saw his assailant and that he saw him near this bridge by which he usually went to his home. He didn't go home by the usual route, but went up this lane. His assailant ran across to the lane and the shooting occurred.

It was the theory of the Commonwealth that appellant shot his brother, then fled to Millersburg, and that he threw this gun over into the Dennis garden as he passed there. From the evidence it appears that the gardens of Riggs and Dennis are enclosed by wire fences. It is not reasonable to suppose that if the appellant is the murderer, and he had fled to Millersburg, he would have stopped, climbed these wire fences and placed this gun and handkerchief in the Dennis garden. The word "placed" was not used here unthoughtedly, for it appears that the gun and handkerchief were placed in this garden. It may be argued that the gun was thrown into the garden. That is possible. A man may throw a gun, but he could not throw the handkerchief, and the handkerchief was found beneath the gun.

If the man who shot the deceased went up the pike to Millersburg, he would have had to go through Dennis' yard, past his home and into his garden, to have placed the gun where it was found. If he had gone up the railroad, he would have had to climb the embankment of the cut to have reached the back of the garden, for the witnesses speak of going down to the railroad, which would indicate that at this point the railroad is constructed in a cut.

If appellant was preparing to kill his brother, it is not reasonable to suppose that he contemplated giving his brother a chance to shoot at him. If he was planning to do anything, he was planning to assassinate him, and if he was planning to do that, it is not reasonable to assume that he would have borrowed a gun to use when he had three guns of his own; neither is it reasonable to suppose that he would have waited for his brother to shoot at him twice before shooting the deceased.

Appellant would not have allowed this gun to have remained in the Dennis garden during the week or more that he was at large, after the killing. He would either have gotten the gun cleaned, and returned it, or else he would have so thoroughly concealed it that no one would have found it.

The witness Fisher says that the lights of this automobile which was parked on the turnpike had not been

turned off, and necessarily, they lighted up not only the turnpike south of there, but also the adjoining property of Anderson, and the point where Anderson first saw his assailant. Whoever the assailant of Anderson was, he did not fear anybody in that automobile. Either he knew there was no one in it or else he knew that the occupant of it was a confederate acting in concert with him.

We are not entirely satisfied with what Will Anderson said about finding this man digging his potatoes, for if the deceased had found him digging his potatoes, he would not have gone up the lane to his home, but would have gone through his property, past the potato patch. If his assailant was there for the purpose of digging potatoes, as soon as he saw that Anderson had discovered him, he would have fled. On the contrary, we know that after Anderson discovered this man, the man ran across to meet the deceased. He had a gun with him. He was looking for trouble, and so was the deceased. The deceased was prepared, and began shooting first. The statement of the deceased that this man was digging his potatoes is unsatisfactory. Men do not dig potatoes in the nighttime, even on moolight nights. If we knew more about the movements of the deceased on the night of the killing, we feel that we would be nearer to a solution of this mystery.

This case is different from that class of cases wherein the responsibility of the accused for the killing is established, and the jury is passing upon the justification or excuse of the accused for the killing. In such a case the finding of the jury is entitled to greater weight than in one like this.

We are constrained to believe that this verdict is flagrantly against the evidence. The judgment is therefore reversed, and the cause remanded with directions to award the appellant a new trial, and for proceedings consistent with this opinion.