## Carter v. Commonwealth.
(Decided Oct. 1, 1935.)

MARSHALL A. DAWSON for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MUR-PHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

Under an indictment charging him with the murder of Roosevelt Washington, Ben Carter has been found guilty of voluntary manslaughter, and his punishment fixed at imprisonment for 21 years. He is appealing.

The homicide occurred at Huntertown, a mile or so from Versailles in Woodford county about 1 or 2 o'clock on the morning of July 1, 1934. On the previous evening, deceased, Wade Washington, George Buckner, and his wife drove to Versailles in the former's automobile. Appellant also went to Versailles, where he bought some groceries. He approached George Buckner, asked him to haul his groceries home, and offered to pay him 10 cents for taking them. Buckner told him he was in an automobile driven by Wade Washington, but that he would give Wade the money for hauling them, which he did. There is some conflict in the evidence as to what occurred in Versailles. The evidence for the commonwealth is to the effect that appellant asked permission to ride home, but was refused, because the springs were weak and the tires bad. At any rate, some controversy arose over the matter and the Washingtons either refused to carry appellant's groceries or he refused to permit them to carry them, and was demanding the return of the 10 cents which he had given to George Buckner. A short time after Wade and Roosevelt left Versailles for their home at Huntertown, appellant caught a ride with Jeff Thomas, who took him a quarter of a mile or more beyond Huntertown to the home of his father, where he and his wife resided. When they arrived, appellant asked Thomas to wait for him until he took the groceries in the house, and, while he was gone, Thomas turned the automobile preparatory to taking him back. He came out with a double-barrel shotgun and passed Thomas, stating that he did not care to ride. Upon arriving at a point on the railroad fill opposite the home of Wade Washington he began calling him, but the latter had gone to the home of his sister some distance away. When he failed to get a response he left, going into what is called the "Ape Yard" in the immediate vicinity. This, it seems from the evi-

dence, is a place of rendezvous for the negroes in the Huntertown settlement. Roosevelt Washington and his wife were separated and living on opposite sides of the street, but it appears a very friendly and cordial relation continued to exist between them. The evidence for the commonwealth indicates that Roosevelt Washington and his wife were sitting in the "Ape Yard" when appellant came upon them. Wade testified that he had gone to bed at the home of his sister when he heard appellant calling him and some one told him he was not there; that he got up and saw him standing on the railroad with his shotgun and did not go out; that he later heard him talking to Roosevelt, saying, "Give me my dime"; that he repeated this several times and Roosevelt said he did not have it, but that he had 75 cents in his pocket; that appellant said, "Give me that, pitch it to me," and Roosevelt said, "Please don't shoot me." That appellant asked, "Where is Wade?" Roosevelt replied that he was at his sister's, and appellant said, "Go get him." Roosevelt said, "All right," and appellant said, "Never mind I will kill you while I have got you," and he heard the gun fire. He testified that there were three or four shots, but that he could not distinguish between the sound of them. Mattie Washington, wife of deceased, testified that she and her husband were in the "Ape Yard" when Ben came up and began cursing Roosevelt and calling him all kinds of names and asked for his dime; that Roosevelt replied that he did not have a dime and appellant told him he was going to kill him, after which she ran away; that appellant had a double-barrel shotgun; that before leaving she offered to give appellant a dime, but he stated he did not want her dime, and at the time he had his gun drawn on her and Roosevelt. She ran about 50 yards when she heard three shots, but testified that she could tell no difference in their sound.

Appellant testified that when he arrived at home he asked Thomas to wait for him; that he procured his gun, went back down to the bottom, stopped at Washington's and called for Wade; that no one answered, and he thought possibly he would be down the road farther; that he went on down and called again and then decided to go back to his brother's and put the gun away; that he started through the "Ape Yard" for that purpose and came upon Roosevelt Washington and his

wife lying on the ground; that Roosevelt sprung to his feet, saying, "What the hell are you doing here?" He replied that he wanted to get his dime, and Roosevelt said, "You had better get the hell away from here," and he again asked for the dime; that Roosevelt said, "You can't get it," and drew his pistol from his pocket; that he said, "Roosevelt, I don't want no trouble, I can't afford to." That as he turned away the pistol fired, the first bullet striking him in the arm; that he then cocked his gun and fired. He gave as his reason for procuring the gun when he returned to Huntertown that he was afraid of Wade Washington.

The evidence discloses that appellant's arm was struck and shattered by a ball evidently fired from a pistol and the doctor testified that his arm would have been immobile and useless after the wound was inflicted. There is considerable evidence on behalf of appellant that the first shots fired appeared to be from a pistol; however, the evidence for the commonwealth indicates otherwise, and according to the evidence of the doctor who attended appellant, the latter could not have fired a shotgun after he received the gunshot wound in his arm.

It is first argued that the court erred in permitting George Washington to testify in rebuttal over the objections of the accused because the father had been in the courtroom assisting the commonwealth's attorney during the trial when a separation of the witnesses had been asked and granted. While it does affirmatively appear in the record that counsel for the commonwealth had requested that George Washington be permitted to remain in the courtroom, it is apparent from brief filed on behalf of appellant that he remained in the courtroom to advise with the commonwealth's attorney. A witness was asked by the defense whether he was near the scene and heard the shots fired, and replied that he did. He was then asked if he could distinguish the sound of the shots, and stated that he could not. In rebuttal, George Washington was asked if this witness did not state in substance to him that he was not there, and he replied in the affirmative. It is therefore apparent that regardless of whether George Washington remained in the courtroom at the request of the attorney for the commonwealth or by permission of the court, this evidence was neither material nor prejudi-

cial, because it is admitted by all who testified that some shots were fired, and the witness did not testify that the pistol shots were fired first.

It is next argued that the court committed prejudicial error in allowing one of the attorneys to draw on the floor a plat of the immediate vicinity of the homicide which the attorney admitted was inaccurate. Some cases are cited indicating that where a plat is drawn and used in a trial, it should be made a part of the record on appeal. The attorney who drew it testified that he was not adept in drawing, and that the plat was not absolutely accurate, but that it did substantially show the surroundings.

In case of Anderson v. Commonwealth, 205 Ky. 369, 265 S. W. 824, cited by appellant, it appears that witnesses who testified constantly referred to a plat drawn on the floor of the courtroom. The opinion refers to the fact that the use of such diagrams results in confusion, and that it is difficult for the appellate court to arrive at the facts in the case on account of reference to diagrams not appearing in the record, and indicated that it would be better practice not to use such diagrams, or, if they were used, a copy should accompany the record. Counsel also refers to the case of Conley v. Commonwealth, 208 Ky. 538, 271 S. W. 566, 567, which condemns the practice of using a diagram which is constantly referred to in the trial and which is not made a part of the record on appeal. But neither of the cases referred to by counsel was reversed because of the use of a plat in the court below which did not appear in the record on appeal; and certainly no prejudicial error was committed in this instance because there was little reference to points on the plat, and no confusion concerning the surroundings arose because of reference by witnesses to points on the plat.

Contention that the court erred in not sustaining appellant's motion for a directed verdict because the corpus delicti had not been established is without merit. While no witness stated in direct terms that the death of Roosevelt Washington was the result of the gunshot wound inflicted by appellant, the evidence establishes conclusively that such was the case. Appellant does not deny that he shot deceased, and it is shown by the evidence that immediately following the shooting, de-

ceased was carried to the home of his father, bleeding profusely from the gunshot wound, and was in a dying condition. He was rushed to a hospital, where he died a day or so later.

Insistence that the court erroneously qualified the self-defense instruction because there was no evidence that accused sought or brought on the difficulty is likewise without merit. Our foregoing recital of the substance of the evidence reveals that appellant left his home armed and hunting for. Wade Washington; that, failing to find him, he ran upon deceased, and, according to the evidence of witnesses for the commonwealth, brought on the difficulty that resulted in the fatal shooting. While the evidence to indicate that appellant abandoned the difficulty and attempted to get away is slight, this issue was presented to the jury under a proper instruction.

It is further urged that the commonwealth's attorney made improper and prejudicial statements in his closing argument to the jury. The statement complained of as appears in the record is:

"There is not a scintilla of evidence in the case, except this boy's unsupported word, that he tried to abandon this difficulty that he had provoked by bringing a loaded shot-gun down there."

Objection was made by counsel for appellant, and the court admonished the commonwealth's attorney to be careful in his statement of the evidence. Counsel for appellant then moved that the statement be stricken, and the motion was overruled. It is insisted that the attorney for the commonwealth misquoted the evidence, because appellant's evidence indicating that he abandoned the difficulty was supported by other witnesses. As already indicated, there was slight evidence indeed to show that appellant abandoned the difficulty. He testified that he told deceased he did not want any trouble, and stated that as he turned the pistol fired. There were no other witnesses to the difficulty. It is true there was some evidence that the pistol shots were fired first, but this evidence did not show that appellant had not provoked the difficulty, or that he abandoned it after it was provoked. It is apparent that the statement of the commonwealth's attorney was within the bounds of legitimate argument, and in no event could it be said

that this statement was calculated to mislead a jury who had heard the evidence or inflame or prejudice their minds against the accused.

Finally, it is urged that the court committed prejudicial error in refusing to admit evidence as to statements by appellant five or six minutes after the tragedy occurred. One witness was asked if five or six minutes after she heard the shots she saw appellant, and whether he made a statement as to why he shot or was shot. The court sustained an objection to the question, and counsel for appellant made an avowal that if the witness were permitted to answer, she would state and it would be true that he said he shot in his necessary self-defense after he had been shot. Counsel maintain that this statement was made after appellant had walked about 50 yards and within a few minutes after the shooting, and that it should have been admitted as a part of the res gestæ. The rule that evidence as to self-serving statement of one accused of crime is incompetent is too well recognized to require citation of authority, and it is apparent that this evidence was not admissible under the res gestæ rule.

Finding no error prejudicial to appellant's substantial rights, the judgment is affirmed.