CASE 27—PETITION EQUITY—SEPTEMBER 25.

## Moore's heirs vs. Shepherd, &c.

APPEAL FROM TAYLOR CIRCUIT COURT.

1. When, in an equitable action, an issue of personal identity is, on motion of one of the parties, without objection by the other, submitted to a jury and a verdict found, and a motion for a new trial overruled, the court cannot, at a subsequent term, disregard the verdict and find the issue the other way. The same weight should be given to the verdict of a jury on an issue in equity as in an action at law. (*Section 343, Civil Code.*)

2. A son was absent, his whereabouts being unknown; his mother became his guardian, received his estate, and afterwards died; it was distributed among her representatives who had knowledge of the manner—and who supposed the ward was dead—in which she held it. *Held*—That the representatives of the guardian held subject to the same trust; that the property never became theirs, and their holding not being adverse, the statute of limitations did not apply.

3. In such a case the distributees of the mother were liable for profits, but not for deterioration not resulting from their neglect.

HOOE & GAITHER, HUNT & BECK, and A. J. JAMES, for appellants.

BRAMLETTE & VANWINKLE, HARLAN & HARLAN, for appellees.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

A very voluminous record of multitudinous facts, apparently conflicting, makes this case vexatiously difficult, and stamps on its face an extraordinary impress peculiarly dramatic, and, therefore, signally interesting.

The great issue is personal identity, involving the question—which of two men, perhaps three, and possibly four, named *William Perry Moore*, was the son of John S. Moore, deceased, of Monticello, Wayne county, Kentucky, to whom, as heir of the decedent, was allotted an estate for which the appellants, as the infant daughters of one of the *William Perry Moores*, brought this suit in equity in the year 1854, about one year after their father's death, in Baltimore, whither he had removed about the year 1845, from Columbus, Georgia.

*William Perry Moore,* the son of *John S. Moore*, was born in Monticello, and there resided until June, 1835, when, in his

eighteenth year, indignant at an ignominious chastisement by his mother, who, after his father's death, had married Isaac Shepherd, he secretly left Kentucky, declaring that *she* should never again see or hear of him.   He left in the night on a horse, taken without leave, from his step-father, but soon restored to his possession by a mail-carrier, to whom it was delivered for that purpose, and the fugitive never returned to Kentucky, or was heard of by his mother until the year 1841, when she heard that a man of his name, likeness, and age, was residing in Columbus, Georgia.   That man entered Columbus about the first of the year 1838, married there in 1840, acted there as town constable, and there the appellants were born, and to two of whom he gave the names of two of the John S. Moore's daughters whom he claimed as his sisters.

In 1841–2, some acquaintances of the fugitive's mother, driving stock to the Columbus market, were requested by her to see the *W. P. Moore* residing at that place, and ascertain whether he was her son.   They accordingly saw him and interrogated him, and reported, and afterwards testified, that, though he resembled her son, seemed to know her daughters and their names, and the names of their husbands, and also the names of other persons in and near Monticello, and said that he was born there, yet, as he did not seem to remember some other persons with whom her son had been intimate, and, moreover, appeared evasive and inconsistent in his conversation, they were inclined to the opinion that he was not her son.   This report, and the fact that a letter she had addressed to him was answered in the handwriting of his wife, induced her to renounce and denounce him as an impostor; and when, after his death, his wife and children came to Monticello to repel all imputation of imposture, and claim the estate in the hands of the wanderer's mother as his guardian, she refused to recognize them or their claim, and this suit soon followed that non-recognition and refusal.

The issue of personal identity was, on the motion of the appellants, with the apparent concurrence of all parties, submitted to a jury, who found that the father of the appellants

was the son of John S. Moore, of Monticello. That verdict was set aside on affidavits for a new trial, for new testimony.

A similar verdict by another jury stood the test of another motion for a new trial, which was overruled, and thereupon the case was continued. Afterwards, without noticing the judgment overruling the motion for a new trial, a new judge permitted other trials, in which there was no verdict; and, finally, another judge, dispensing with a jury, dismissed the petition, from which judgment this appeal is taken.

A question of fact and a question of law are presented for our consideration. 1st. What is the most rational deduction from the testimony? 2d. What is the legal effect of the second verdict and of the judgment overruling a motion for. a new trial?

1. The concurrent testimony of his family relations, and other intimate acquaintances, describes the person of *William Perry Moore*, the son of John S. Moore, of Monticello, when he left that place, as peculiarly characteristic and substantially as follows: About eighteen years of age; about five feet nine and a half inches high; weight from 160 to 170 lbs.; shoulders broad and rather stooped; breast correspondently thin and hollow, indicative of hereditary consumption. Hair light brown; eyes bluish grey; skin fair, with sallow tinge; hands and feet large; port careless, awkward, and abrupt; a small scar, nearly round, on the edge of the left jaw; *an elliptical scar ranging from the inner corner of the left eye, through the brow, to the left temple;* a dimple in the chin, and another on the left cheek. And, *with full and exact precision,* the same description is given of the father of the appellants by a multitude of his acquaintances in Columbus, Georgia.

Two of the Monticello witnesses testified, also, that the *Wm. Perry Moore,* who was the son of John S. Moore, had, by fracture or otherwise, lost a corner of one of his front teeth; *and exhumation of the father of the appellants disclosed the same dental* defect, and also the impress on the skull of the scar through the left eyebrow. Had those two witnesses testified falsely, it is almost certain that their error would have been proved by the other Monticello witnesses who testified against

the appellants. The fact thus testified to must be, therefore, accepted as established.

And the testimony of several of his acquaintances in Baltimore described him exactly as the Georgia witnesses did, and proved that he died of pulmonary consumption, and had claimed Kentucky as his birthplace and title to property here.

All these minute and extraordinary coincidences would, if unrebutted by any other fact or circumstance, indisputably prove that the father of the appellants was the son of John S. Moore, of Monticello.

But, remarkable as it may be, there are some countervailing facts, both striking and perplexing.

1st. As before suggested, the father of the appellants sometimes seemed not to know persons in Monticello, and Wayne county, whom he should be presumed to remember, if he had been born and had lived there until he was eighteen years old. The only clue to this apparent inconsistency is his avowed determination to conceal himself from his mother as long as she might live. But the inquiry at once arises why did he, at the same time, and often, say that he was John S. Moore's son, and was, as one of his heirs, entitled to a fourth of his estate? The only answer is, that he was anxious, not to renounce or bar his claim, but to keep it alive, and, at the same time, to conduct himself in such a way as to make his repudiated mother doubt and even deny his identity. And it seems to us that this is a plausible and probably true explanation of his apparent contradictions and inconsistencies. And this construction is fortified by the significant fact, that, claiming John S. Moore's three daughters as his sisters, he gave to two of his own daughters the very peculiar names of two of those recognized sisters. *Sarah Adelaide* and *Mary Evaline* are the names of the two oldest of the appellants, and two of John S. Moore's daughters bear the same names.

This cogent coincidence, and the avowed and natural reason for it, are not neutralized by the assumption that, before those coincident nominations, the father had obtained in Columbus minute information about the family of John S. Moore, and its status and names. If he were an impostor, such a pre-

sumption would be intrinsically improbable, until after he had named his first child; for, until after that time, he had not, so far as the testimony goes, been interrogated by, or had any communication with, any person from Wayne county or its neighborhood, concerning his own history or that of John S. Moore. Nor does it appear, that, while he lived in Columbus, the names of John S. Moore's daughters had been communicated to him by any person in Kentucky, Georgia, or elsewhere.

2d. The proof shows that a boy named *William Perry Moore*, born and raised in Wheeling, Virginia, and resembling in many peculiarities the *William Perry Moore* of Monticello, left Wheeling in the year 1836, as an employee on a steamboat destined for the Chattahoochie and Columbus, Georgia, and had never afterwards returned or been heard of, except perhaps once. He might have reached his destination some time in the year 1836. The father of the appellants was also employed on a steamboat in the Chattahoochie trade; but he did not appear there sooner than the first of the year 1838.

Moreover, the Wheeling Moore was two or three years younger than he, was not quite so robust, and is not shown to have had any of his dimples or scars on the face. We could not, therefore, safely presume that the Wheeling Moore was the father of the appellants.

3d. But the appellants are beset with another vexatious circumstance much more formidable and extraordinary. A man named *William Perry Moore* was in the Texan army of independence, in the years 1836–7. In age, size, complexion, and other respects, he resembled the son of John S. Moore, of Monticello, in an impressive manner, even in the dimples and scar towards the left temple. The only difference between the scar of the soldier and that of John S. Moore's son, as described by the testimony, is, that the latter was from the *inner* corner of the left eye, *through the eyebrow*, to the temple, and the former was from the *outer* corner of the left eye to the temple. But this apparent diversity may not prove any essential variance in fact, because the only witness who.

VOL. II—9

described the soldier's scar did not seem or profess to have any precise recollection of the location of the scar, nor even of the side of the face on which it was, and, therefore, he might easily be mistaken in a slight deviation from a portion of its entire range; and that he was so mistaken is rendered quite probable by the inexplicable fact that this solder *said that he was born in Monticello, Kentucky, and owned real estate and negroes there; that he intended, as soon as he could, to return there to see his family and enjoy his property; that he left there in consequence of maltreatment by "some of the family," and that he rode, for some miles, a horse taken from "a member of the family" and returned it by the mail-boy, and manifested an acquaintance with persons in Wayne and the adjoining county of Pulaski.*

Now, unless he was the fugitive son of John S. Moore, it would be difficult to account for his striking resemblance to him, or to imagine how he knew the persons he described, or *why or how he fabricated a tale so minutely and circumstantially coincident with the motives and manner of the exodus of John S. Moore's son.*

It is difficult, therefore, to escape the conclusion that the Texan soldier was that son, who, having left home in June, 1835, went to Texas, and there joined the army in 1836. And if this be so, a hard and vexatious problem is presented to the appellants for solution; for the testimony tends strongly to show that the soldier, *William Perry Moore,* was killed in Texas, in July, 1841, when their father, a married man with one child, was living in Columbus.

This problem can be solved favorably to their claim in one only of two ways: 1st. By supposing that the Wheeling Moore was the Texan soldier, who left home in the year 1836; or 2d. By presuming either that the soldier was neither the Wheeling nor Monticello Moore, or *that the Moore who was killed in 1841 was not that same soldier.* The first supposition cannot be reasonably indulged, because the Wheeling Moore is not shown to have been identified by the facial peculiarities of the soldier and the Monticello Moore, and because, more especially, we can presume no motive for his repudiation of his birthplace, and the assumption of a false one, nor any

clue to the history of the Monticello Moore and tale of the army Moore.

And, if we admit, without deciding, that the Texan soldier of 1836–7 was the Monticello Moore, still we may, consistently with the testimony, presume that the Moore killed in 1841 was not that same soldier Moore. The Moore who was killed was called and known only as "*Perry Moore,*" and not only does no witness describe him so as to approach the identification of him with the soldier "*William Perry* Moore," but the description of him lacks most of the same personal and peculiar characteristics; and, moreover, William Perry Moore, the Texan soldier of 1836–7, expressed an anxious purpose to return home as soon as he should be discharged, and could obtain the necessary means, which he expected whenever discharged, and, doubtless, did then get in his pay, and which was in 1837, allowing him, if he then started homeward, time to reach Mobile in the fall of that year, engage to serve on a Chattahoochie steamboat, and arrive on it the first of the year 1838 at Columbus, all of which the father of the appellants did, according to the proof. And, besides, the Wheeling Moore was commonly called " Perry Moore," and resembled the " Perry Moore " who was killed in 1841 much more than the *William* Perry Moore of Monticello, or of the army of 1836–7. We are, therefore, inclined to the conclusion that the said soldier was the *William Perry Moore* of Monticello, and was, also, the father of the *appellants.* But whether that soldier was the Monticello Moore or not, we incline to the opinion that, all things carefully considered and harmonized, as far as may be logical, the probabilities preponderate in favor of the conclusion that the Monticello Moore was the father of the appellants.

If, however, the probabilities be equiponderant or incline the opposite scale against the appellants, we are, nevertheless, of the opinion that the last verdict should stand, and conclude the issue of identity. According to the common law, a verdict on an issue in chancery, dependent on controverted facts and contradictory or doubtful evidence, was entitled to considerable influence, and certainly to enough to make it

decisive whenever it is well sustained, as the verdict in this case is, by the testimony rationally weighed and considered. But our Code of Practice should be .construed as intended to modify the common law in this respect, by giving to such a verdict as much effect as a verdict in a common law action would be entitled to on a motion for a new trial, under and according to the provisions of the Code. (*See section* 343 *on Trial, and also the chapter on New Trials, applying to verdicts on all issues equally and without discrimination.*) And even if this be not the precise purpose and effect of the Code, we cannot doubt that, when, as in this case, the parties prefer a jury and elect a trial of an issue of fact by the jury rather than the court, the verdict is entitled to as much effect as if either party had demanded a jury as a legal right.

The verdict in this case having been affirmed by the judgment overruling a motion for a new trial, there was, according to the record, no revivor of it in the subsequent proceedings, and, without the consent of the appellants, the court had no right to revoke its judgment at a subsequent term. The subsequent orders by the court *sua sponte* of successive juries and final resumption of the issue by the court, neither set aside the verdict nor estopped the appellants from ultimately relying on it as an authoritative decision of the litigated question of identity.

We are, therefore, of the opinion that the circuit court erred in dismissing the petition.

The plea of the statute of limitations, by the distributees of the property allotted to the father of the appellants, is not sustained. Knowing that it was held in trust by his guardian, they not only took it as such, but expressly agreed to hold it subject to the claim of himself or representatives.

With knowledge of the trust they took the property by implication of law, as much subject to the trust as it was in the hands of the guardian, and she continued to hold her own allotted portion just as she had held the whole before that distribution. The limitation of an implied trust in movable property is only five years after an open renunciation of the trust by the trustee and an evident use of it wrongfully as his

own absolute and exclusive property; but the division itself in this case necessarily implied that the recipients made it only because they believed that *W. P. Moore* was then dead without issue; and, consequently, each distributee took to hold subject to that contingency, and not in his own absolute right, if W. P. Moore was then alive and should ever claim his portion, or leave any descendant who should claim it; and this is intrinsic proof that their possession and use were not adverse to said *Moore* or his descendants, and should not be presumed to have been so; but this legal presumption is made even stronger and more conclusive by extraneous testimony that, when the distribution was made, the parties expressly agreed to hold their respective portions subject to the contingent right of W. P. Moore or his issue, and, to that extent, they were bailees and must be presumed to have so held. Neither any statutory nor presumptive bar could, on such facts, apply to the remedy sought by the appellants as the children of said W. P. Moore.

The distributees are, therefore, respectively liable to restitution *pro tanto* with intermediate *profits*, if any, but not responsible for deterioration without their fault, nor for the value of any slave who may have died or become free without their connivance or assistance, but should account for the value of any they may have sold, and the value also of their use. Upon this basis, on the return of the cause, the circuit court will decree to the appellants their father's allotted portion of his father's estate.

.. Wherefore, the judgment is reversed, and the cause remanded for proceedings and decree conformable with this opinion.