## Tarkaney v. Commonwealth.

(Decided October 30, 1931.)

A. J. MAY, A. J. KIRK, EDWARD L. ALLEN, O. C. HALL and OSCAR TABORY for appellant.

J. W. CAMMACK, Attorney General, and GEORGE MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

Steve Tarkaney was found guilty under an indictment charging Joseph Schuster, Stanley Bob, Steve Tarkaney, John Proboco, and Jack Emody with the murder of Sam Adams; his punishment was fixed at life imprisonment, his motion for a new trial was overruled, and he has appealed.

Emody, Schuster, and Proboco have also been convicted, and have appealed. These four cases were considered together by part of this court, and considered together by the entire court. The evidence in this case is better developed than in the others, and for that reason this opinion will be more elaborate than the others.

These men are continually referred to in the record as "these foreigners," yet the record shows Schuster was born and raised in Locustdale, Pa.; Emody, near Poncetona in that state; Tarkaney at Pocahontas, W. Va.; and we do not now recall what the record discloses

as to the nativity of the others, if indeed it contains anything about it.

In the year 1929, Schuster was part owner of and in charge of the operation of a little mine in Floyd county, on the east bank of the Big Sandy river, near the village of Auxier, which is situated on or near the west bank. The name of Schuster's company was "The Miller's Creek Mining Co.," but by some means this mine had come to be known as the "Monkey-Wrench Mine," and we will so refer to it.

This was a small operation. The camp, beginning at the river and going east, consisted of a storehouse or commissary in which there was a portion next to the river used as a bedroom; about 50 feet from this was a four-room cottage occupied by Schuster and his family; about 50 feet from it was a boarding house, 56 feet long and 26 feet wide; 130 feet from it was the power house, and still further east the tipple, etc. All of these, except the last two named, were of recent construction, and built of secondhand material.

Andy Polita, with his family consisting of his wife and his two stepdaughters, Wanda and Bertha Mazeski, lived in and operated this boarding house. At the time in which we are interested, Stanley Bob, his daughter, Jack Emody, and John Proboco lived and boarded with him, and Steve Tarkaney took his meals and kept and changed his clothes there, but slept with Schuster's son in the back room of this storehouse.

### The Coming of Adams.

The construction of this boarding house and the coming of these men from Pennsylvania and West Virginia caused some dissatisfaction among the men, who had theretofore worked at this mine, and soon rumors became rife that "these foreigners" were to be run away, and soon the rumor was that this was to be done during the Christmas holidays. Schuster recalled that when he had been at work at Jack's creek, Sam Adams, a deputy constable or a deputy sheriff, he is referred to both ways, was employed there as an officer, and he wrote to Adams and offered him $6 per day to come there and guard the mine during the holidays. He and Adams were friends, and he had tried to employ Adams during August, 1929, to guard the mine, and to do odd jobs around the tipple, but Adams, who had a crippled arm declined this work, but accepted the employment offered

him later, and came to the mine on Thursday, December 19, 1929.

He met Schuster, but found him very busy as his partner James Dawson was there that day, and he and Dawson were busy going over the books and making some sort of settlement of the business. Schuster went with Adams to see Mrs. Polita, and arranged with her for Adams to get his dinner there, and to board with her. He explained to Adams that he was busy, and that he should make himself at home about the camp until Mr. Dawson left. Adams ate his dinner and his supper at Polita's. Dawson left about 6 p. m., and after supper Adams, Schuster, and perhaps Proboco met in the store where Schuster was posting up the day's work, and they and Adams talked until about 8:30 or 9 p. m. Then Adams started to the boarding house, and Schuster went to his home.

Tarkaney had gone to Schuster's after supper to read the Huntington Herald-Dispatch and to assist Schuster's little daughter, Margaret, with her school work. After Schuster came in, Mrs. Schuster prepared some tea, which the members of the party drank, then Tarkaney and the son of Schuster went to the store to sleep, and the family retired.

### DISAPPEARANCE OF ADAMS.

When they left the store, Schuster had asked Adams to come in and have some tea or some lunch, but Adams declined, and said he was not feeling well and went to the boarding house. Adams went into the sitting room of the boarding house and sat before the fire for awhile, then went with Emody, with whom he was going to sleep, into their bedroom to go to bed. Emody undressed and retired, but Adams merely removed his coat, his shoes, and his pants, put his holster and pistol under his pillow, and got in bed. Proboco also retired in the single bed which he occupied. So far as this record discloses, that is the last that was seen of Adams. During the night, Emody became cold and waked up; Adams was not there, and Emody pulled the cover back over him and went to sleep again.

### THE FIRST INVESTIGATION.

Soon inquiries began to be made about Adams and Schuster, and the occupants of this boarding house were called before the grand jury, but nothing came of this investigation.

## The Body Found.

On March 7, 1930, a boy was going along the east side of the river and was startled to see a man's feet sticking up out of the sand at the edge of the water near a path that led down to the river. He reported this to Mr. Lee Hall who went there with him, and he says he found a man's feet sticking up out of the sand. This was about one-fourth of a mile from this camp.

Tarkaney had made objections to all evidence relative to the post mortem examination of the body found, and reserved exceptions when it was admitted over his objections.

The lapse of time from death to the holding of the post mortem must affect the weight of the evidence so obtained, and, after sufficient time, even the admissibility of it, but we are making no intimation how much time will be required. It would require less time as to the viscera and soft parts of the body than as to the bones.

One of the leading cases on this subject is Williams v. State of Maryland, 64 Md. 384, 1 A. 887, where a man had died on November 26, and evidence obtained at a post mortem examination of his body, held on December 27, was admitted. Let us say, however, the question upon which that evidence was admitted was whether or not the neck of the deceased had been broken.

We have a domestic case, which, by the way, is a most interesting opinion. Moore's Heirs v. Shepherd, 63 Ky. (2 Duv.) 125, where evidence of a scar on the skull disclosed by a post mortem examination was admitted, though made some years after Moore's death.

Hall summoned the county officers, and the body was exhumed. It had been buried face down in a shallow grave dug in the sand near the water. This body found, so the man who exhumed it says, had about 24 inches of sand on the head and shoulders, and the lower legs from about midway between the knees and ankles were sticking up out of the sand. Apparently water had been over the body, for it and the clothing on it were wet and muddy. The river then was at a very low stage. A pistol was found under the body which Dr. Weems describes as a "Smith and Western .38 or .44," but Mr. Hall says it was a .45 Colt. Some official papers were found in the inside pocket of the dress coat on the body found, and $8.87 in money and some cartridges fitting this pistol were found in the pants pocket. There was one empty chamber, two empty hulls, and three car-

tridges in the pistol. There is no evidence this is the pistol of Sam Adams.

One of these official papers was a warrant for the arrest of Willie Dean issued by F. E. Damron, J. P. Floyd Company September 29, '29, and the return thereon is "Executed in full, 10-1-29, by Sam Adams," a strange sort of a return on such paper; another was an order of attachment in case of Hopkins v. Cook, issued by the police judge of Wayland September 10, 1929, and on it the return is "Executed by delivering a copy to the defendant on 10-9-29, by Sam Adams, D C." There is no evidence this is the handwriting of Sam Adams.

The body found had on it a blue serge suit; the pants were worn without suspenders, but supported by a belt about eight inches too big for the body. There were no socks upon the feet, these with the supporters attached were in the left pocket of these pants. The vest was buttoned, but one of the arms was not through the armhole of the vest, and the garment was drawn up under the arm pit. There is no evidence these were the clothes of Sam Adams. There were some teeth missing; the doctor says he does not remember whether they were loose and he pulled them out or whether they were out and gone when the body was found. These the doctor says were knocked out either after death or shortly before that, as there was no sign of any healing of the gums. The doctor mentions no sign of bleeding about the mouth.

The right ear of the body had been cut off, and the doctor says there was no sign of any bleeding from it. The body found had been scalped, and an area about four inches wide and five inches long from front to back had been removed; a part of this had been cut by a sharp instrument. Doctor Weems examined the body found, and thought this had been done before death, because he saw some blood among the tissues adhering to the skull. The doctor says the only parts of the body showing any signs of decomposition were the parts of the lower extremities that had been exposed to the weather. The shoe was off the left foot and lying beside it (this was a shoe for the right foot), and some animal had eaten away the heel of that foot and some of the bone, and the tooth marks showed on the bone, a portion of which was gnawed away. The shoe for the left foot was on the right foot. Neither shoe was tied. He said the skin was tough and showed no decomposition, and of the

skin on the head, he said it was so tough you could take hold of it at any point and not pull anything off of it. The doctor says there was over the whole body a moldy mildew or slime, such as you may find on a pond. The doctor thought the signs of blood in the tissues adhering to the skull indicated this scalping was done during life while circulation was still maintained. This is ordinarily a reasonable deduction, but while circulation ceases at death, the blood may migrate after death, as we have all observed in the case of meat lying on trays in butcher's stalls where we have seen blood ooze out of the meat of animals that had been carefully bled in the slaughtering, butchering, and preparation of it for human consumption.

The doctor describes with meticulosity the things he did to ascertain if there was any fracture of the skull, and he says there was none. He was asked if this wound on the head was sufficient to have produced death, and his answer was: "From the looks of it, I wouldn't think that alone would cause death." He was asked about gunshot wounds, and answered: No sir, there were no gun-shot wounds on the body." The commonwealth then asked him: "But all the wounds that you found on the body were sufficient to inflict death?" His answer was:

"Yes sir. The wound on the head could have bled sufficiently to have caused death, but that alone wouldn't have been sufficient to have caused death, to exclude the bleeding. Without bleeding the wound on the scalp would not have caused death."

In one of these records, he says that, other than some blood in the tissues adhering to the skull, there was no sign of bleeding anywhere. It will be noted the doctor makes no mention of any blood in the hair or on or about the head. No one says there was even a spot of blood on any of the clothing on this body anywhere. The doctor describes a wound on the neck of the body found thus: "It wasn't a tear in the skin but a depression near the center and faded off towards the edges." The doctor offers no explanation of this, he says nothing of how it was made, or what effect it may have had upon the victim. The defendant's objection to the admission of this evidence was overruled. In 30 C. J. P. 220, section 449, we find this:

"This fact that a post-mortem examination was made long after death is no reason in itself for its

exclusion as evidence, if the body was in such a state of preservation that the jury could judge whether its condition was caused by injuries inflicted before or after death."

In Wharton & Stille's Medical Jurisprudence, vol. 3 p. 386, we find this: "Between eight and twelve days after death, the whole body presents this green appearance, which has become darker in color, and is accompanied with a stronger smell. . . . On some parts of the body, especially on the extremities, and on the neck and breast, dirty red streaks will be seen where the skin remains clear. . . . Between fourteen and twenty days after death, a bright green and reddish-brown color spreads over the entire body. . . . The features are distorted, and the entire physiognomy so changed as to make it impossible even for the nearest relatives to recognize the person." Witthaus & Becker, in their work on Medical Jurisprudence (volume 1, p. 455), say the identity of the body is destroyed in from 14 to 21 days, and that the epidermis then peels off in patches.

If this body found had been positively shown to be that of Sam Adams, there would still be grave doubt about the establishment of the corpus delicti. "Corpus delicti" does not mean the dead body of the deceased; it means the body of the offense. See State v. Dickson, 78 Mo. 447. The corpus delicti has two component elements in a case of homicide, viz., death as the result, and the criminal agency of another as the cause. Of course we have here a dead body, but is it that of Sam Adams, and was death produced in it by criminal means? David Adams says the body found is the body of Sam Adams. He was asked if he had seen the body, and then was asked this question: "Was it the body of your son, Sam Adams?" He answered, "Yes, sir." Willie Johnson makes a similar statement, but neither attempts to give in any detail, just now he recognized this body. That is the extent of the identification.

We know our friends from their facial outlines, the flash of their eyes, and their expressions. That constitutes their countenance, their identity, we recognize them thereby, either in life or their bodies shortly after death, and one may testify to the identity of their friends in life or to that of their bodies when they have recently died; but when through fire, severe bruising, mangling, or by the process of putrefaction and decay, the face, the

countenance, the identity has been destroyed, the rule is different, the witness then must describe his friend as best he can and describe those things about the corpse that correspond to similar things he remembered about his friend, and it is for the jury to say whether or not the corpse is that of his friend.

We shall discuss briefly one of the leading cases on this question.

In People v. Wilson, 3 Parker, Cr. R. (N. Y.) 199, a dead body with marks of violence upon it had been washed ashore. It was alleged to have been the body of Captain Palmer, for whose murder the prisoner was being tried. No direct evidence of that identity was or could be given. But the criminal fact of a death by violence having been fully established, the identity of the remains was proved by circumstances. Personal recognition had become impossible, and identity was established by an inference from resemblances. The height of the deceased was shown, an unusual length of face, and a widening of the end of the little finger, to which in a general way, the body corresponded. But a more important fact was that the captain had imprinted his name upon his arm and leg, and in the same portions of the body found the skin had been cut away, except that on the leg the letter "P" remained visible. A brother-in-law of deceased, who had seen the body, was asked the direct question whose body it was; but the court would not permit an answer, saying that the question was not the ordinary one of personal identity, since the body had been submerged for five months, but was one of an inference from resemblances, which the jury, and not the witness, must draw.

If the body found is that of Sam Adams, it had been dead for 80 days, had been buried in the sand, which in Wharton & Stille's work, vol. 3, p. 385, it is said to allow a more rapid putrefaction than heavy clays, and it had been under water; and in the churchyard scene in Hamlet, act V, scene 1, Shakespeare makes clown No. 1 to say: "And your water is a sore decayer of your whoreson dead body." The body found, if that of Sam Adams, had been dead for 80 days, and its condition, as described by the witnesses, is so at variance with the recorded experience of mankind as to make us doubtful of the identity. We will discuss some other questions, and return to this later.

## The Riding Breeches.

Upon the body found, there was a pair of yellow whipcord riding breeches, so the doctor describes them. One leg of of these breeches had been pulled a part of the way up on the right leg of the body found, and the left wrapped around its left leg apparently to help carry it. It was the contention of the commonwealth that these were Tarkaney's breeches, and that contention is based on the evidence of Le Grande Mayo, who was asked and answered this question:

"Q. What is your best judgment as to where you saw them before you saw them on the body? A. My best judgment is that I saw Steve Tarkaney with them on."

The commonwealth seized three pairs of riding breeches which Tarkaney admits are his. Because these are of about the same size as those on the body found, and because of Mayo's evidence, the prosecution insisted his guilt was thereby established. Tarkaney says these three pairs of breeches were all he had, he shows where and when he got them, and that the yellow whipcord pair taken off the body found did not belong to him. He shows this by himself, by Schuster, by the woman who did his washing for over a year in West Virginia and often washed these for him, by his brother, by Anna Odom, his cousin at whose home he left them when he made a trip to the West, and by whom they were packed and shipped to him when he began to work at this Monkey Wrench Mine, and by Wanda Mazeski and Bertha Mazeski, who washed them for him at the Monkey Wrench Mine.

## The Bullet Holes.

There were two bullet holes found in a plank of the wall of this store building, and two cartridges had been fired from the pistol in the grave of the body found. Two men testified they had heard two pistol shots fired about 10 or 11 o'clock on the night of December 19. These shots, the prosecution contends, were fired by Adams during the struggle which took place in this storeroom while he was being murdered, as they contend. The lumber of this store building was secondhand material. Defendants offer no explanation of these two holes. They contend the two shots these men heard were the discharge of torpedoes used in the neighboring railroad

yards. There were some stains on the floor of this store-room, and some planks were sawed out and sent to Lexington, where by bacteriological tests, these stains were shown to be human blood. The presence of blood on this floor is accounted for by the defendants by showing this storeroom was used as a first aid station there at the mines, and it is shown some six or seven wounds were dressed there, some of which bled quite freely.

### The Blood in the Path.

One witness testified he had some business with Schuster on December 22, 1929, and while he was there he noticed some blood in a cinder path between this storehouse and Schuster's residence. The defendants account for this blood in this manner: Schuster handled fresh meat at this store. This was shipped to them frozen in pails. When the meat was thawed so they could get it out of the pails, it was the practice to open the door and throw the blood in the pail out the door; but the witness who discovered this blood says this is not the case, because he swears he could tell human blood from the blood of a hog or a cow by looking at it, as he walked along. The ease with which this witness determined the nature of this blood as he walked along should commend him to the attention of the scientific world.

### The Motive Alleged.

Since all this evidence is circumstantial, it was important that the prosecution show some motive. So a witness named Taylor was introduced, who said he knew of some trouble Schuster had with Sam Adams in 1922 over some money Schuster had borrowed from Dow Smallwood, and, when asked to tell about it, he said:

> "I was coming down the track there and Joseph Schuster and Sam Adams were standing on the railroad and I heard Sam Adams say to him, 'If you had paid this money there wouldn't have been any damn trouble about it,' or 'there wouldn't have been any damn rag-chewing about it,' and Joseph Schuster turned and walked off and said, 'Every damn dog has his day,' and one went one way and one went the other way."

Schuster testified that nothing of the kind occurred. Smallwood was introduced, and he said he never did loan

any money to Joe Schuster, and that this loan was made to Bill Schuster, and Joe had nothing to do with it.

## The Boy's Remark.

After the first investigation, the disappearance or death of Sam Adams was perhaps the subject of much talk in this mine camp, and Wanda Mazeski was permitted, over the objection of Tarkaney, to relate a remark which a son of Schuster had made. She, Tarkaney, Schuster, and Emody were playing cards, and some one spoke of four kings as being dead, whereupon this little four- or five-year-old boy remarked: "Dead as Sam Adams." She does not say that they heard the remark, and was unable to tell of anything they said or did to indicate they heard it. We are unable to see in this any evidence of guilt.

## Tarkaney's Remark.

After all of "these foreigners" had been before the grand jury at the time of the first investigation in January, in February Tarkaney went over to West Virginia to collect some money that was due him. While he was there, the body found was exhumed, and warrants for the arrest of these foreigners issued, and Tarkaney was arrected in West Virginia, and the prosecution showed that, when he was arrested, he asked the officer, "Is it the same case?" or "Is it the Adams case?" This is seized on as an evidence of guilt, but we are unable to regard it as such, and consider it to be quite a natural remark for the man to make under the circumstances.

## Our Conclusions.

It is shown, even by the evidence for the prosecution, that there was a desire on the part of others in and about this mine to get rid of "these foreigners." Those who had that desire had plenty of opportunity to manufacture this evidence. The two bullet holes were not discovered, and the plank with the blood upon it was not sawed out until about ten days after these foreigners had been arrested and lodged in jail. It is doubtful whether the body found is that of Sam Adams, but perhaps with his father's identification of it, and that of Willie Johnson, there was enough evidence on that point to go to the jury; but if we grant that the body found is that of Sam

Adams, there yet remains the question, Was death produced in it by criminal means? There is no evidence that it was. If we concede all that, then there remains no evidence Tarkaney had any part in it, or any connection with any one who did.

A citizen should not be punished on mere suspicion. Shelby v. Com., 24 S. W. 614, 15 Ky. Law Rep. 552; Overbee v. Com., 226 Ky. 433, 11 S. W. (2d) 86; Little v. Com., 210 Ky. 494, 276 S. W. 158; Watkins v. Com., 227 Ky. 100, 12 S. W. (2d) 329; Anderson v. Com., 205 Ky. 369, 265 S. W. 824; Lockard v. Com., 193 Ky. 619, 237 S. W. 26; Partin v. Com., 197 Ky. 840, 248 S. W. 489; Hall v. Com., 149 Ky. 42, 147 S. W. 764; Saylor v. Com., 158 Ky. 768, 166 S. W. 254; Sipes v. Com., 221 Ky. 603, 299 S. W. 183; Holmes v. Com., 218 Ky. 314, 291 S. W. 383; Forgy v. Com., 219 Ky. 177, 292 S. W. 799; York v. Com., 235 Ky. 751, 32 S. W. (2d) 331; Slone v. Com., 236 Ky. 299, 33 S. W. (2d) 8; Moore v. Com., 229 Ky. 765, 17 S. W. (2d) 1021.

A defendant may be convicted upon circumstantial evidence, but it must be strong and so connected with the defendant as to destroy all presumptions of his innocence. Here are some things we have said:

"It is the rule in this state that a conviction for crime may be had upon circumstantial evidence alone, but the evidence must be of such character that it may not be reconciled with the presumption of innocence that attends every accused person, and must possess such force as to exclude every reasonable hypothesis of the defendant's innocence." Moore v. Com., 223 Ky. 128, 3 S. W. (2d) 190, 191.

"The evidence relied upon to convict appellant is as consistent with his innocence as with his guilt, and under the authorities above quoted, it was the duty of the trial court to peremptorily instruct the jury to find the appellant not guilty." Pardue v. Com., 227 Ky. 207, 12 S. W. (2d) 288, 289.

"All of the circumstances proven against him, though relevant in an investigation charging him with this crime, are explainable, naturally and reasonably, consistent with his innocence. Altogether, it scarcely justifies a suspicion of the guilt of appellant. The presumption of the innocence of the accused in an investigation of a criminal charge is a presumption both of fact and of law. It continues till there is some evidence to overcome it, and it is the duty

alike of the court and of the jury to reconcile the circumstances of the case with that presumption, where it reasonably can be done." Wilkerson v. Com., 76 S. W. 359, 361, 25 Ky. Law Rep. 780.

"The rule that a conviction in a criminal case may be had on circumstantial evidence alone is subject to the qualification that, if the evidence be as consistent with defendant's innocence as with his guilt, it is insufficient to support a conviction." Mitchell, etc. v. Com., 217 Ky. 158, 289 S. W. 208, 209; Mullins v. Com., 196 Ky. 687, 245 S. W. 285; Johnson v. Com., 217 Ky. 705, 290 S. W. 693.

The conviction of these men is rested entirely on suspicion, surmise, and supposition. Because this thing could have happened, as it was by the attorneys for the prosecution pictured to this jury, it has reached the conclusion that it did so happen.

In Louisville & N. R. Co., v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257, 259, we called attention to the difference between an inference and a supposition. We defined those terms. We said: "Supposition has no legitimate support or habitation in judicial administration."

We have here an opportunity to illustrate the danger of allowing supposition to have a place in judicial administration. There was here a spirit of opposition to the coming of these foreigners. Sam Adams, during this day, December 19, was in and about this camp. Those opposed to these foreigners had abundant opportunity to learn why he was there. They learned he was there to protect these foreigners. We do not know what they said to him or he to them, but here was a motive for them to get rid of Adams. If the rule that because a thing could have happened it may therefore be supposed it did happen be applied, then there is room to suppose that this element, that was opposed to these foreigners, either then bargained with Adams that he should disappear, or else made such threat that Adams desired to disappear. We may suppose that that was the reason Adams declined Schuster's invitation to have a cup of tea and bit of lunch with him. We may suppose that is the reason that when he retired he did not remove his clothing, knowing he would soon go out again. He had put his pistol and his holster under his pillow and he could easily remove the pistol, but the cloth of the pillow would be inclined to cling to the leather of the holster,

and, because it did so cling, he was perhaps afraid of awakening his bedfellow, Emody, so he left his holster. In a few days, this disappearance had brought about a grand jury investigation, but it did not run the foreigners away. The grand jury may have failed to indict these men because of utter absence of proof of the corpus delicti. That must be supplied, and we may suppose that in order to do that a corpse was procured to take the place of Adams. We know that that can be done, because the records of this court show that in an adjoining county it was done. It was perhaps difficult to get a corpse exactly matching the body of Adams. The teeth may not have been like the teeth of Adams, so they solved that problem by knocking out some of the teeth of the corpse. The right ear may not have matched the right ear of Adams, and the solution was to cut off the right ear of the corpse. This corpse may have had long, luxuriant hair, whereas Adams was baldheaded, or vice versa, so that problem was solved by scalping the corpse. The corpse was not as heavy a man as Adams; therefore, the belt of Adams' clothing didn't fit, and that was solved by buckling the belt up tighter so as to make it fit the waist of the corpse. Because of rigor mortis, it was perhaps impossible to get the right arm of the corpse through the armhole of the vest, and that may account for the way in which the vest was put upon the corpse. It was desirable that this body should be found; therefore, it was buried in the sand near where a path led down to the river. Time was required to secure such a corpse. Hence this burial was delayed, and that may account for the body having decomposed no further than it had, and less than could have been expected in 80 days. That explains why the pistol wasn't rusted away. They wanted this body found. Therefore, they buried it with the heels sticking out of the ground; but since the human knee will only flex in one direction, that made it necessary that this body be buried face downward in order to have the heels stick up. This may account for the shoes being on the wrong feet; for the absence of socks on the feet and their presence in the pocket. The official papers found in the dress coat pocket on this body, if carefully investigated, might throw some light on this, but the returns on those papers looked suspicious. One does not usually see a warrant of arrest returned executed in full without further explanation of how it was executed. Such papers are not usually issued on Sunday, but one of these

was. One doesn't usually see an order of attachment executed by delivering to the defendant a copy. That is unnccesary. See Thacker v. Cook, 236 Ky. 159, 32 S. W. (2d) 738.

If these writs be genuine, we wonder why Adams did not send them to the office whence they issued when he wrote these returns upon them. Why was he carrying them around in his pocket more than two months thereafter? There may be a solution of all this. Adams had a crippled arm. If that defect existed in the bony portion of the arm, careful inquiry would disclose the nature of it, and an X-ray examination of that arm of the body found may yet disclose the truth and solve the mystery. On proper application that may be done. See Sexson v. Com., 239 Ky. 177, 39 S. W. (2d) 229. What we have said illustrates the danger of ever allowing surmise, supposition, or suspicion to have a place in judicial administration. We have passed on no question of evidence, but have treated all of it, whether material or immaterial, relevant or irrelevant, competent or incompetent, admissible or inadmissible, good, bad, or indifferent, as if it were all properly here, and it altogether fails to make a submitable case against Tarkaney.

It is not sufficient, in a case of circumstantial evidence, that the circumstances proved coincide with, account for, and therefore render probable, the hypothesis of guilt. They must exclude, to a moral certainty, every other hypothesis. Circumstantial evidence should be acted upon with great caution, where the public anxiety for the detection of the perpetrator of a great crime creates an unusual tendency to exaggerate facts and draw rash inferences, Pitts v. State, 43 Miss. 472, because, of all the various sources of error, one of the most copious and fatal is an unreflecting faith in human testimony. The fact of death from criminal cause must be established by clear and unequivocal proof, either by direct testimony or by presumptive evidence of the most cogent and irresistible kind. Burril on Circumstantial Evidence, 679; Wharton's Criminal Evidence, secs. 324, 325; Wills on Circumstantial Evidence, sec. 3, p. 206. It is a necessary step in the establishment of the corpus delicti in cases of homicide, that the body, when discovered, be satisfactorily identified as that of the person whose death is the subject of inquiry. Wills on Circumstantial Evidence, sec. 3, p. 212. The proof must show that a body found is the body of the person for whose

murder the prisoner has been indicted. Circumstantial evidence of identity, however, in any case must be clear and cogent and leave no room for reasonable doubt. State v. Gorman, 54 Mo. 530, 14 Am. Rep. 481; State v. Dickson, 78 Mo. 438.

Until the fact of a criminal death is made out, it is, of course, fruitless to inquire who was the criminal. There is no excuse for punishing this defendant, if another did this murder, or if no murder has been done.

The first question in this case is: Has a man been slain? We have direct evidence of death. Next we must look for clear and cogent evidence that the death is the result of some criminal agency. Then comes the question, who is the slain and who is the slayer; and the evidence must establish the identity of the one and the agency of the other, before there is anything to submit to a jury, and the evidence in this record does not do this.

We are reserving all questions but this one. Tarkaney was entitled to a directed acquittal.

The judgment is reversed.

Whole court sitting.