## Duncan v. Commonwealth

March 16, 1943.

As Modified on Denial of Rehearing June 22, 1943.

Edwin R. Denny, Fritz Krueger and Joseph J. Grace for appellant.

Hubert Meredith, Attorney General, and Arthur T. Iler, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

Appellant, convicted of murdering his brother-in-law, Edward Colyer, was given life imprisonment. In motion for a new trial he set up seven or more grounds, on appeal reduced to the following:

(1) The court erred in admitting incompetent evidence; (2) rejecting competent evidence; (3) in refusing to sustain motion for a directed verdict of not guilty; (4) the verdict is flagrantly against the evidence. Finally, that the prosecuting attorney indulged in inflammatory and prejudicial remarks in argument. Since the proof of the sordid tragedy was of circumstantial nature, it may be better to give a resume of appellant's testimony.

Appellant at the time was about twenty-nine years of age; Colyer just past twenty-one, both reared in the same community. Appellant in March 1935 was teach-

ing in a rural school in Pulaski County, when he married a sister of deceased, the latter about fourteen years old at the time. After their marriage appellant and his wife kept house and deceased, at solicitation of appellant, went to live with them. Appellant bore all Colyer's expenses; clothed him, furnished him board and looked to his education, although he was not a man of means. The proof is such as to indicate an unusual interest in the boy which lasted until his death; so much so as to indicate an unnatural affinity.

In the latter part of 1940, appellant, his wife and Colyer moved to Chattanooga and in May, 1941, from there to Cincinnati, where deceased began to earn his own living, and at his death he had in bank about $350. While in Chattanooga Colyer became acquainted with two girls, Cleta Adkins and Edna Hale. He married the former in January, 1942, and shortly thereafter his wife came to the Cincinnati home; the four resided together for about two weeks when the wife returned to and remained in Tennessee. There is no dispute as to these background facts, nor to the fact that on April 9, 1942, appellant and deceased left Cincinnati at 1 p. m., in appellant's automobile, admittedly for the purpose of a meeting between Colyer and Edna Hale, his former friend, whom a fortune teller had advised him he should have married instead of the Adkins girl.

Appellant, while willingly making the trip, says he made efforts to dissuade Colyer. They arrived in Chattanooga around nine o'clock the following morning, and visited the place where the girl was supposed to have been working, but failed to locate her. Appellant then ostensibly made a telephone call to her, but reported to Colyer that she was not at home. The two then started to return to Cincinnati, and had reached Berea, Kentucky, when appellant told Colyer that he had only pretended to make the call. He said they were near home then, and he felt that Colyer would not desire to go back. He said that while in Chattanooga Colyer drank beer, but there was no claim that he was intoxicated. When they neared Berea Colyer was driving. The two had made arrangements to relieve each other on the trip.

After appellant told Colyer that the call was bogus, they went on northwardly, but after passing through Berea, Colyer turned and started south, appellant protesting, and in persuasion offered him $10 to turn to-

ward home.  Colyer agreed, and when near Mt. Vernon stopped the car on the right side of the highway.  Appellant got out of the car and walked behind it, as he says for the purpose of answering a call of nature, and, according to agreement to relieve Colyer of the driving, and to turn the car back toward Cincinnati.  He says he heard Colyer say, "We will go back.  I will turn the car.  Hurry up and come on."  Colyer started the car, turning to the left, but headed it directly across the road towards a steep embankment.  Appellant says he grabbed the bumper and was thrown to the ground.  As the car reached the level, it burst into flames; he heard glass breaking and assumed that Colyer had gotten out.  He became very much excited, perhaps to the point of hysteria, and did not go down to the automobile.  Two girls were passing and they picked appellant up and drove him to the telephone exchange in Mt. Vernon.  When they got there appellant happened to think of Colyer, and he and the girls went back to the point of the accident. He says he made no effort to extricate Colyer's body from the car; that several persons had arrived at the scene and some one of them held him back.  The two girls testified that appellant was very much excited.

As soon as appellant returned he was plied with questions, but did not recall much of the conversation. He made inquiry as to the whereabouts of Colyer, and advised persons present that if he had not escaped from the car he should be gotten out, and asked that attempts be made.  Some of those persons present went down to the car and looked into the front seat; they did not see Colyer.  They testify that before appellant suggested their going to the car, had they believed that some one was in the car they might have made the rescue, since prior to their going down, the front portion only was burning.

Appellant withstood a rather rigid cross-examination, denying flatly that acts and circumstances developed later had been the cause of his brother-in-law's death.  Other evidence introduced in behalf of appellant went mainly to show that as soon as he got back to the scene he had insisted on going to the car, and for others to go.  Other proof went to show that during all the times Colyer lived with appellant's family they were on the best of terms; that Colyer was treated like a son; that they conducted themselves in an agreeable manner, with-

out friction or trouble of any kind. There was also proof as to the good general reputation of appellant; on the other hand there was testimony which tended to weaken the favorable testimony, it being shown that his reputation for truth and veracity was not good.

The Commonwealth proceeded in the prosecution on the theory that appellant had taken Colyer's life so as to enable him or his wife to collect certain life insurance policies taken out by Colyer, in which they or one or the other, were beneficiaries. There also runs through the record proof of what was mentioned above as an unusual affinity.

The Commonwealth's proof shows that the car was seen by the two Carter sisters as it went over the embankment, though they did not see appellant at that time. They drove past, but shortly returned to the scene and observed the car on fire, but not burning fiercely. Appellant ran towards them and he asked them to get him to a telephone as quickly as possible. They drove him to the exchange in Mt. Vernon, a short distance away. Appellant during the trip told them that his brother-in-law was in the car, but he thought he had escaped. Appellant went into the exchange but made no call. Returning to the Carter car he asked to be taken back to the scene, suggesting that Colyer might not have gotten out. These witnesses testify that he told them, or persons who had gathered at the scene, that no one was in the car when it left the road; that after the fire was well under way, appellant begged by-standers to open the door and see if there was any one in the car. This was impossible at the time, but after the flames had subsided some one opened the rear door, and Colyer's body, badly burned, was found behind the front seat. There was nothing to indicate that the car was wrecked; it had gone down the embankment without overturning. There were indications that the rear part of the car was more damaged by fire than the front. There was a two gallon (burned) oil can in the rear. There were also two medium sized rocks, and a home-made blackjack, the latter lying under Colyer's body, a piece of partially burned cloth, thought to be part of his trouser leg, twisted around Colyer's legs.

Dr. Griffith, who shortly afterwards examined the body, described a scattered fracture just behind the left ear, and blood coming from it. He also saw cloth and

an unburned streak just above the knees, and blood on a portion of a coat or jacket.

Shortly after Colyer's wife returned from Tennessee, and within two months, deceased took out a policy with an accident insurance company, limited as to cause of injury (a travel policy), for $1,000 in case of death resulting from accident in the enumerated ways, payable jointly to his sister and appellant. Another was a "family" accident policy insuring the lives of all three parties with appellant's wife named as beneficiary, doubled in benefits in case of accidental death in an automobile. Another appears to be a life policy, in the sum of $2,000, payable to appellant, or in case of prior death to his wife, taken out on the application of Colyer on April 6, 1942. The remaining policy insured Colyer against death occurring in a limited number of ways, one in meeting death in an automobile accident, the sum payable being $2,500, graduated upward by annual premium payments, and payable to appellant.

One of the policies was found by detectives at the home in Cincinnati, under the mattress of a day bed in the kitchen. This was the original. The others (copies) seem to have gotten into the record by officers of the various companies. The officers did find another policy issued by the same company on the life of appellant, payable to his wife.

The whole record is void of proof (except by appellant) that Colyer knew of the issuance of any of the policies in question, with the exception of the $2,000 policy payable primarily to appellant, and then to the sister, and one other. He apparently signed the application and submitted to a preliminary examination on the $2,000 policy. There is some proof that appellant paid premiums on this and his own policy.

Appellant says the $2,000 policy was taken out at the instance of Colyer, and that he paid the initial premium at Colyer's suggestion. He also said Colyer had a $1,000 policy payable to his mother, and he thought the mother and father had a policy. The father had a policy upon which he had paid the premiums since the boy was two years old, and the boy had a small policy payable to the mother. He denied that he had ever seen or used the blackjack; he said that he had placed a rock (which was exhibited) on the battery plate when they left Cin-

cinnati; the plate of the battery had no thumb screws, and the rock was placed there to hold it in position. The battery was under the front seat of the car. Later, and before the Chattanooga trip, the thumb screws were replaced, and the rock left in the car under the seat.

One witness said this rock was found after the accident under the seat. Appellant knew nothing of the other rock which was found in the car, which, according to one witness, was on the front seat on the right hand side. Appellant's wife said she knew that Colyer had a blackjack, and avowed that he told her he was going to put it in the car, and "didn't want appellant to know anything about it."

On the contentions that the court erred in overruling motion for a directed verdict, and the verdict is flagrantly against the evidence, it is only necessary to refer to the evidence detailed. While it is properly classified as circumstantial evidence, our established rule is that where there is any evidence of a probative character, whether direct or circumstantial which tends to establish guilt, it is the duty of the court to submit the case to the determination of the jury. Miller v. Com., 182 Ky. 438, 206 S. W. 630; Utterback v. Com., 190 Ky. 138, 226 S. W. 1065. It is only where the proffered evidence does no more than create a mere suspicion, and the jury is required to grope into the field of speculation, without any incriminating evidence on which to base a verdict of guilt, that the trial court should direct a verdict, or this court should reverse. Pardue v. Com., 227 Ky. 205, 207, 12 S. W. (2d) 288; Tarkaney v. Com., 240 Ky. 790, 43 S. W. (2d) 34, and cases cited in both. A careful review of the testimony in the instant case convinces us that if it falls in the first class, and that the circumstances strongly pointed to the guilt of the accused.

Taking up now the technical objections, we find that while Mr. Bowman was testifying in response to a question regarding the coat worn by appellant, "How much blood was on it?" he answered, "It had a right smart. The coat will show for itself; it is here." An officer had testified that the coat had blood on it "where he had put his hand in the pocket and some around his shirt collar." There was no objection made at the time, nor was there any demand of counsel that the coat be produced, but at the close of the testimony appellant moved to withdraw from the jury any consideration of blood on the cloth

or on the strip they say his legs were tied with, without motion that they be produced. It was shown to the court that the articles mentioned had been sent to a laboratory for test, and the blood had been removed, that they were not in the same condition, hence could not be properly used in evidence, whereupon the court overruled the motion. That there was blood on the coat there can be no doubt, since on the morning following the tragedy appellant's attention was called to it, and he explained it by saying that Colyer had a blood blister on his finger and he "dobbed" it on him, because Colyer had no handkerchief. The only question that could have been determined by exhibiting the garment, had it been in the same condition, was the quantity of blood. We are of the opinion that this testimony did not prejudice the substantial rights of accused.

Dr. Griffith was called in rebuttal and asked, "Would a blood blister on the finger, and then three days old, if that bursted would it produce blood or water?" and he answered, "water." There was no objection at the time to this testimony, but at the close and after cross-examination on the subject there was motion to exclude it on the ground that the Doctor had not qualified as an expert. We need not discuss the question as to what would have qualified Dr. Griffith to answer a simple question, or whether his conclusion was correct. It does appear that he had theretofore testified and said that he was a regular practicing physician, and graduate of a medical college of undoubted standing. The matter in question did not call for specialist testimony.

The proof shows that several days after Colyer's death, officers arrested Mrs. Duncan, but that she later consented that they might search her apartment in Cincinnati, and in the company of the officers they went to her apartment and there found one of the policies. Appellant moved the court to require production of the search warrant and the officers admitted that none had been issued; objection is now made to the exhibition of that particular policy on the ground that it had been illegally seized, based on the ground that the officers went to appellant's home while he was in jail, and obtained this damaging evidence prejudicially used against him, reliance being had on Elmore v. Com., 282 Ky. 443, 138 S. W. (2d) 956, which upon review we find not to be applicable here, because of difference in basic facts.

The testimony of one of the officers, who secured the policy, was that the appellant's wife had given written permission to search, and she accompanied the officers. Mrs. Duncan had also told officers about the policy before they searched the apartment. When the apartment was reached she told the officers she thought the policy was under the studio couch in the kitchen, "if you want it hunt it." The officer had no difficulty in finding it. The objection here interposed was solely to the original New York twenty pay life policy. If it be conceded that the particular document was obtained by an unauthorized search, the question remains as to whether the fact that the paper itself was gotten into the evidence prejudiced the rights of appellant. Linneman, a representative of the insurance company which had issued the policy, testified concerning the policy, and to the effect that application was made by Colyer. He had personally interviewed Colyer as to the time he would report for a physical examination, and also contacted him at another time for filling certain forms with relation to naval or other service. He also says that Colyer gave him a money order payable to the insurance company. He also testified that he and a medical examiner for the insurer witnessed Colyer's signature to the application. This evidence went to the jury without any objection in respect of the matters above related.

The other policies as said, were brought into the record by copies furnished by the three companies and there were no objections to their introduction. On the sole issue as to whether or not Colyer knew anything concerning the issuance of any one of the policies, and in the light of Linneman's testimony, it is impossible to see how the presentation of the document itself prejudiced the rights of appellant. Had the policy not been found, a copy could have been introduced, or in the absence of a copy Linneman could have testified concerning the facts about which he was interrogated, and as we view his testimony it was competent in every particular, a fact which counsel realized, since it was permitted without objection, and which was helpful to appellant.

Aside from this, appellant though objecting merely to the introduction of the policy itself went into great detail covering the matters of application for, the issuance of the policy, and payments of the premiums, giving such

evidence as would indicate that Colyer did know about the issuance of the particular policy in question. Under these circumstances we fail to see how the introduction of the paper itself could have resulted in prejudice to appellant's substantial rights.

It is contended that the court erred in sustaining objection to a question asked Mrs. Duncan concerning a statement to her by Colyer as to who should be the beneficiaries in the policies, or as we read the evidence, more particularly the straight life policy. Appellant himself had testified without objection as to the method and manner of procurement of the policies, and in such a way as would indicate that Colyer knew of their procurement. Mrs. Duncan then testified, without objection, that she, her husband and Colyer had discussed "these policies."

The particular question to which objection was interposed was "Did Edward ever disclose to you how he wanted it or had made the beneficiary in this policy?" Upon objection being sustained, avowal was made:

"The witness, if permitted to answer, would truthfully state that Edward Colyer said he didn't want it made to his father because he would drink it up, and he didn't want it made to his sister-in-law (his wife) because she would just marry on it again; that we had raised him, and he thought we should have it."

The last few words of the avowal are perhaps responsive to the questions; the other portions are not. The only issue of fact in respect of motive was whether or not appellant procured the policies or any of them without the knowledge of deceased. As to the life policy this matter seems to have been well cleared up. It may again be conceded that it was competent for the witness to have said that the deceased had disclosed to her that he desired the policies, or some of them, made to her or to her husband as beneficiaries, although she was interested as beneficiary in one or more of the policies. Her former answer that Colyer had discussed with her and appellant "these" policies, was sufficient to indicate that Colyer knew that they had been procured with his knowledge. This testimony had no relation to anything save the question of motive or here the lack of motive which is not essential to a conviction for crime.

It is or becomes important in weight when the evi-

dence, direct or circumstantial, fails to make a satisfactory case, and then only as evidence. Russell v. Com., 276 Ky. 38, 122 S. W. (2d) 1009. The issue of fact here was whether or not the policies were issued without any knowledge on the part of deceased. There was admitted evidence showing that he did have such knowledge, as well as evidence tending to show good reasons why he should have made his benefactors, or his sister and brother-in-law beneficiaries, without explanation or undertaking to say what he had said concerning the reasons.

In view of the fact that there was ample evidence, circumstantial as to the overt act as it was, even without the evidence tending to show motive, it cannot be concluded that the jury in rendering the verdict it did was influenced in its conclusions by the ruling of the court on the particular question discussed. Final complaint is of remarks made by counsel in closing the argument to the jury, which it is claimed poisoned the minds of the jury, and were prejudicial to appellant's rights. We have examined each of the statements complained of, and while one was uncalled for, it was not of such nature as to inflame the minds of or influence the jury. Others were, as we view them, admissible under the proof adduced. We see no reason for holding that either was of such character as to bias the jury or prejudice appellant's substantial rights. Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4.

Finding no error on the whole case prejudicial to appellant's rights, the judgment must be and is affirmed.