## MILLS v. COMMONWEALTH.

Court of Appeals of Kentucky.

Feb. 6, 1953.

Luker & Tooms and J. Milton Luker, London, for appellant.

J. D. Buckman, Jr., Atty. Gen., and W. Owen Keller, Asst. Atty. Gen., for appellee.

SIMS, Chief Justice.

Henry Mills was convicted of grand larceny and his punishment was fixed at confinement in the penitentiary for one year. In seeking to reverse the judgment he insists the court erred: 1. In not directing a verdict in his behalf; 2. in admitting incompetent evidence against him.

Mills operated a farm and ran a country store in a remote section of Laurel County near the post office of Fletcher, some 10 or 12 miles from Corbin. Madison Parker, 77 years of age, had a room and boarded in the Mills home for some twenty months before it was robbed on March 25, 1949, and $2800 belonging to Parker was stolen therefrom. Parker moved from the Mills home on April 1, 1949, and during the April term of the Laurel Circuit Court the grand jury indicted Mills for grand larceny, charging him with taking Parker's money.

Parker had a car but could not drive it. He went to Corbin on the morning of March 25, and was accompanied by Mills' wife and son, the latter driving the car. Mills testified that after the three had left in the car, a man he did not know came to his store around 10:00 A.M., and wanted some cigars. After Mills got the cigars the man pulled a pistol from his pocket, saying, "This is a stick-up, be quiet." Mills was held in his store for 20 or 25 minutes and heard two other men ransacking his home which was adjoining or very near the store. Presently, one of the two men came in the store and took $63 from Mills' pocket and $800 from a money belt Mills was wearing while a confederate held a pistol on Mills. He further testified the two men shut him in the store, and after hearing them drive away Mills stated that in about 20 minutes he kicked a piece of tin off a broken front window and went in his home and saw Parker's money box and pocketbook lying on the floor. He immediately went to the Fletcher post office, about a quarter of a mile distant, and telephoned the sheriff and state police.

The postmistress, Mrs. Cora Stanberry, testified it was between 11:30 and 12 o'clock when Mills arrived at the post office. He did not mention that one of the robbers wanted to buy cigars, nor how he got out of the store. Her husband asked Mills if Parker had any money in the house, to which he replied: "Not that I know anything about."

Stanley Blankenship, the sheriff, and Ed Adams, a state policeman, arrived promptly on the scene and made a thorough investigation of a large number of papers, "about a bushel", removed from Parker's trunk and scattered on the floor by the robbers. This investigation by the officers lasted an hour and a half or two hours, but they found no money and both of them testified they saw no pocketbook by the side of or on a trunk identified as belonging to Parker. The officers testified "there were nearly one thousand of these envelopes" and they did not look in each one of them. Officer Adams testified that "close to 12 o'clock" Mills told him the robbers got $2800 from a box Parker had in the house. This statement was very damaging to Mills' defense since very shortly before he had told Mrs. Cora Stanberry's husband that Parker had no money in the house that he knew of. After making that statement to Mr. Stanberry, he then told the officer not only that Parker had money in the house but the exact amount he lost in the robbery.

Another bit of evidence is damaging to Mills. Parker, Mrs. Mills and her son arrived home "between sundown and dark". Mills and his wife went into the ransacked room with Mrs. Mills holding a lamp. Mills testified he found two envelopes rolled up in some of Parker's underwear, one envelope contained $420 and the other $500. Mills handed this money to Parker and testified he and Parker put it in a box in the smoke house that night without counting it. Mrs. Mills testified that when she and her husband found the money he called to Parker and the latter came in and counted it.

It seems that Parker was divorced and had resided with his sister, Mrs. Dan Westerfield, for about two and a half years before he came to live in Mills' home on July 19, 1947. Parker testified Mills told him that Mrs. Westerfield said she was going to sue Parker, and Mills advised him to withdraw his money from the bank, which

he did on April 5, 1948. Mrs. Westerfield denied she told Mills she intended to sue her brother.

Officers Blankenship and Adams testified that Mills told them he kicked the tin off the window and escaped from the store. However, these officers said the tin was on the window when they examined the store on the day of the robbery. Parker testified that Mills told him he kicked off this tin and escaped, but the morning after the robbery Parker examined the tin and it had never been disturbed.

Mr. and Mrs. Harold Westerfield drove by Mills' store between 10 and 10:30 o'clock on the morning of the robbery and they saw Mills between his store and barn. They noticed nothing unusual and saw no strange cars in the vicinity as they drove through this little community on their way to Corbin. Another neighbor of Mills, Dicie Bargo, between 10:30 and 11 o'clock on the morning of the robbery drove by this store with Bonnie Westerfield, and Dicie saw nothing unusual or any strange cars in the vicinity of Mills' store.

Mills testified when Parker came home and was told of the robbery, Parker stated he did not have a dime in the house. Parker denies making such a statement and is corroborated by Mills, who himself had admitted finding $920 of Parker's money and giving it to him. It was further testified by Mills that right after the robbery Parker told him "a bunch was aiming to rob me, they have tried it before". Parker denied making any such statement.

Witnesses were produced by Mills who testified Parker stated to them that nobody but Dan Westerfield knew he had any money in the house. These statements were denied by Parker. Mills also introduced several witnesses who testified they saw strange cars in the vicinity of the store on the morning of the robbery which were driven by people who did not reside in the community. However, such testimony did little more than raise a question of fact as to whether strange people and strange cars were in the vicinity on the day of the robbery and has no direct bearing on the case.

Mills relies on that line of cases which hold that while a conviction may be had on circumstantial evidence alone, such evidence must be of such a convincing nature as to exclude any reasonable hypothesis of innocence. And if the evidence only creates a suspicion or probability of guilt by showing only an opportunity for the accused to have committed the crime, it is insufficient to authorize a conviction, and the court should direct a verdict of not guilty. Tibbs v. Com., 273 Ky. 356, 116 S.W.2d 667; Tarkaney v. Com., 240 Ky. 790, 43 S.W.2d 34, and the many authorities cited in these two cases.

■ Without again reviewing and analysing the evidence to which we have referred, it will suffice to say it unerringly points to Mills' guilt. He never explained how the front door of the store was closed, and the glaring contradictions in his own testimony create more than a suspicion that he committed this crime and convince us, as it did the jury beyond a reasonable doubt, that he is guilty.

■ Counsel for appellant admit that the incompetent evidence of which they complain was not of a prejudicial character. On cross-examination Mills was asked: "Do you know why Stanley Blankenship and Ed Adams would swear that on the next day after the robbery there was no tin on the window?" Again he was asked, "I reckon if you took the old man's money and robbed him, and took all the money he said you did, you would come in here and swear it to this jury?" Such questions are argumentative and objections should have been sustained to them. However, it cannot be said with reason that they were prejudicial.

It is argued here that the jury must have had a reasonable doubt of accused's guilt, else they would not have fixed his punishment at the minimum. Of course, there is no way of knowing how the jury arrived at the punishment, but the fact the record shows accused was in poor health might have influenced it in fixing his punishment.

The judgment is affirmed.